IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID SWAIN,

      Plaintiff,      Case No. 3:07 CV 3891

 -vs-

                MEMORANDUM   OPINION

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

KATZ, J.

This matter is before the Court on the Report and Recommendation ("R&R") of United States Magistrate Judge David S. Perelman (Doc. 24), Plaintiff David Swain's ("Plaintiff") objections to the R&R (Doc. 25), and Defendant Commissioner of Social Security's ("Commissioner") reply (Doc. 26).  In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981), this Court has made a *de novo* determination of those of the Magistrate's findings to which Plaintiff objects.

**I. Background**

The relevant background for this case is accurate and hereby incorporated as described in the December 3, 2008 brief on the merits filed by Commissioner.  (Doc. 20).

STATEMENT OF THE CASE

Plaintiff filed an application for DIB in September 2002 alleging that he had been disabled since August 27, 2000 due to limitations related to a back problem (Tr. 69-71, 81). Plaintiff's insured status for purposes of eligibility for DIB expired March 31, 2002 (Tr. 230, 303). The Social Security Administration (SSA or the Agency) denied Plaintiff's application initially and on reconsideration (Tr. 52-53, 61-68). Administrative Law Judge Frederick McGrath held a hearing on November 9, 2004, at which Plaintiff (represented by counsel) and vocational expert (VE) C. Young appeared and testified (Tr. 200-217). In a decision dated February 16, 2005, the ALJ found that Plaintiff was not disabled because he could perform a significant number of jobs despite the limitations caused by his impairments (Tr. 26-33). After the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 4-22, 34), Plaintiff sought judicial review in the Northern District of

Ohio (Tr. 270-302). The Agency and Plaintiff stipulated to remand for a new administrative hearing and a new decision, and the court ordered remand pursuant to the stipulation (Tr. 267-68).

On remand, the record was further developed and Plaintiff appeared with his wife and an attorney and testified at a hearing held by ALJ McGrath on June 22, 2007 (Tr. 320-332). VE Joseph Thompson also testified at the hearing (Tr. 328-31). In a decision dated August 10, 2007, the ALJ found that Plaintiff could perform a significant number of jobs despite the limitations caused by his impairments and therefore was not disabled (Tr. 230-39). Plaintiff filed exceptions to the ALJ's decision, but the Appeals Council declined jurisdiction (Tr. 218-26). Therefore, the ALJ's decision stands as the Commissioner's final decision in this matter pursuant to 20 C.F.R. §§ 404.955, 404.981, 404.984. Plaintiff subsequently filed a civil complaint, and the matter is now ripe for judicial review pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF THE RELEVANT FACTS

### Background

Plaintiff was 46 years of age at his alleged onset of disability in August 2000 and 47 years of age when his DIB insured status expired on March 31, 2002 (Tr. 69, 237). He has a high school equivalent education and past relevant work experience including jobs as a woodworker, truck mechanic, and automotive instrumentation technician (Tr. 87, 90-97). Plaintiff alleges that he has been disabled since August 27, 2000 (Tr. 69).

### Plaintiff's Testimony

At the February 2004 hearing, Plaintiff testified that he could not work due to loss of use of his leg due to sciatic nerve pain, an inability to sit or stand for more than about 30 minutes at a time, and a neck problem (Tr. 202). He "popped the disk" in his lower back in August 2000 but did not see a physician at that time because he could not afford to do so (Tr. 202). He closed his woodworking business no later than September 2000 and had not worked since then (Tr. 203). Neurosurgeon Dr. O'Hara performed back surgery on January 14, 2002, but the surgery was not successful (Tr. 204). Plaintiff testified that scar tissue resulted in sciatic nerve irritation and he was worse after the surgery than he had been before it (Tr. 204-05).

Plaintiff testified that on an average day he had pain at a severity of 5/10, which increased to 8-9/10 if he irritated the nerve or fell (Tr. 205). Plaintiff reported left-leg weakness and numbness and stated that his leg gave out without warning about once a week (Tr. 205). He had fallen about six times in six months (Tr. 206). He was not taking anything for the pain because "normal barbiturates and opiates . . . don't really help the pain" (Tr. 206). He also complained of "blinding headaches" caused by bone spurs in his neck, which had been confirmed by an MRI scan performed about a week before the hearing (Tr. 206).

Plaintiff estimated that he could sit half an hour at a time, stand half an hour, and walk 10 minutes (Tr. 208). He could lift about a gallon of milk (Tr. 208). He fixed cereal for himself, watched television, tried to read, listened to music, and

went to the grocery store if he had to (Tr. 208). Plaintiff testified that he did no household chores (Tr. 208). He thought he had depression and had used Wellbutrin and Neurontin, but he felt the depression symptoms worsened on the medications and he stopped taking them (Tr. 209).

At the June 2007 hearing Plaintiff and his wife testified that his symptoms had worsened since the 2004 hearing (Tr. 323-27).

Medical Evidence

Plaintiff reportedly sustained a back injury when lifting a pot from a stove in his kitchen in August 2000 (Tr. 128, 190). Plaintiff reported back problems to Dr. Bernblum in December 2001 (Tr. 155).

In January 2002, Dr. O'Hara performed microdiscectomy surgery to repair a left paracentral herniation of the L5-S1 disc producing left S1 radiculitis (Tr. 134). In February 2002, Dr. O'Hara noted that straight leg raising test on the left produced low back pain but no radicular symptoms in his leg (Tr. 115). An MRI showed no displacement of the left S1 nerve root and Dr. O'Hara prescribed physical therapy and advised Plaintiff to resume normal activities if he was doing well (Tr. 115, 150).

In April 2002, Plaintiff reported bilateral leg pain and low back pain to Dr. Hoeflinger, but motor and sensory function was normal in Plaintiff's lower extremities and his gait was steady (Tr. 126). In May 2002, Plaintiff reported that his left leg pain had disappeared but he continued to have right leg pain (Tr. 125).

In June 2002, Plaintiff saw Dr. Salvi for pain management and a trial of epidural steroids was recommended (Tr. 128-30). On examination, Dr. Salvi noted that Plaintiff had no exacerbation of pain with extension or flexion of the lumbar spine or lateral bending, normal reflexes, normal sensation, normal muscle power, negative straight leg raising bilaterally, and a normal gait (Tr.129). Plaintiff's mood and affect were reportedly pleasant (Tr. 129). Dr. Salvi indicated that he saw no evidence of facet-generated pain or radiculopathy (Tr. 129).

In July 2002, Plaintiff saw Dr. Bassett for pain management evaluation (Tr. 190-92). Plaintiff told Dr. Bassett that his left lower extremity pain had resolved but he continued to have pain in the right low back and hip with radiation down the right leg to the ankle (Tr. 190). On examination Plaintiff had mild paravertebral muscle tenderness but was nontender over the sacroiliac joints (Tr. 191). Straight leg raises were positive but he had no pain with extension (Tr. 191). Range of motion was limited to the hips but was otherwise normal (Tr. 191). Motor and sensory examinations were essentially normal but Achilles reflexes could not be elicited (Tr. 191). Dr. Bassett assessed Plaintiff as having postlaminectomy syndrome and some degenerative disc disease at L45 and L5-S1 (Tr. 191). Plaintiff was provided with instruction on proper posture and lifting techniques and an injection at L5-S1 was discussed, and Plaintiff was instructed to advise the doctor if he wanted to proceed with the injection (Tr. 191).

In October 2002 Plaintiff saw Dr. Gainsburg, a neurologist, on referral from Dr. Bernblum (Tr. 173). Plaintiff reported that he was pain free for a week after back surgery, but redeveloped low back pain and right leg pain, with pain having

spread to his left side in recent weeks (Tr. 173). Plaintiff described his pain as "aggravating" and complained that he could not function normally (Tr. 173). On examination, Dr. Gainsburg got "the distinct feel of depression" but neurological function in the upper and lower extremities was normal on examination (Tr. 174). Lumbar bending was moderately limited, and straight leg raising produced sacroiliac and buttock pain (Tr. 174). Plaintiff walked bent forwards and to the left (Tr. 174). Dr. Gainsburg described the February 2002 MRI as showing "expected postoperative changes" (Tr. 74, 148-51). He thought Plaintiff had chronic lumbosacral sprain syndrome and depression (Tr. 174).

      Plaintiff returned to Dr. Gainsburg in November 2002, with Dr. Gainsburg noting that a recheck MRI showed "expected postoperative changes at the operated L5-S1 level on the left" (Tr. 172). There was no indication for surgery; instead, Dr. Gainsburg prescribed Neurontin and physical therapy (Tr. 172). After a few weeks, Plaintiff told Dr. Gainsburg that the Neurontin had been "significantly beneficial" and that Wellbutrin prescribed by Dr. Pierce had been "of significant benefit in calming him" (Tr. 171). In January 2003 Dr. Gainsburg completed a residual functional capacity form in which he opined that Plaintiff could perform less than sedentary work[1] (Tr. 168). Plaintiff did not see Dr. Gainsburg again until May 2003, when he complained of neck pain, not low back or leg symptoms (Tr. 170). MRI of Plaintiff's cervical spine showed mild disc bulging unlikely to be of clinical relevance (Tr. 187). Plaintiff complained of cervical symptoms again in June 2003, but said nothing about low back or leg symptoms (Tr. 169).

      Plaintiff first saw Dr. Pierce in November 2002 (Tr. 185). As of March 2003 Plaintiff reported 80 percent control of his symptoms with prescribed treatment (Tr. 186). However, Dr. Pierce opined that Plaintiff was incapable of even sedentary work (Tr. 186). He provided an even more pessimistic opinion in March 2005, asserting that Plaintiff had been so limited since January 2002 (Tr. 19).

      Dr. Congbalay reviewed Plaintiff's medical records for the Agency in December 2002 and opined that Plaintiff could: lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; occasionally climb ladders, ropes, or scaffolds; and, had no manipulative limitations (Tr. 161-62).

      Dr. Morton reviewed Plaintiff's medical records for the Agency in May 2003 and opined that Plaintiff could: lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to four hours in an eight-hour day; sit

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

about six hours in an eight-hour day; never climb ladders, ropes, or scaffolds; and, had no manipulative limitations (Tr. 178-80).

Plaintiff saw Dr. Calderon for neurological consultation in May 2004 on referral from Dr. Pierce (Tr. 188). Plaintiff told Dr. Calderon that Neurontin had brought "some partial attenuation of low back complaints" for several weeks but that it had ceased controlling his pain and he tried to "go up on the medication on his own" resulting in side-effects (Tr. 188). Plaintiff also claimed that he had taken "multiple narcotic medications including Vicodin, Percocet, Darvon" and had a high tolerance to those medications and needed to take an excessive amount with "only some mild partial relief" with side effects (Tr. 188). Dr. Calderon's motor, sensory, and deep tendon reflex examinations were essentially normal (Tr. 189). He assessed Plaintiff as having chronic low back pain syndrome and ordered a repeat MRI (Tr. 189).

Plaintiff saw Dr. Medkhour for neurological consultation in December 2004 on referral from Dr. Pierce (Tr. 15-16, 198-99). Plaintiff complained of severe neck pain, headaches, and back pain (Tr. 197). He was not taking any medications (Tr. 196). Plaintiff told Dr. Medkhour that he was allergic to Neurontin and Wellbutrin (Tr. 197). MRI of Plaintiff's cervical spine revealed degenerative changes and Plaintiff was given teaching material regarding the care of his neck and back (Tr. 197). Results of sensory testing were inconsistent, but strength and reflex testing revealed no abnormality (Tr. 197). Plaintiff described his pain as 3/10 in severity (Tr. 197).

<u>Vocational Expert's Testimony</u>

C. Young testified as VE at the 2004 hearing (Tr. 209-15). The ALJ posed a hypothetical question to the VE, directing him to assume an individual with Plaintiff's vocational characteristics who was limited as follows:

- light exertion;[2]
- no climbing ladders, ropes, or scaffolds;
- no work around unprotected heights;
- no squatting, stooping, or crawling;
- required a sit/stand option; and,
- able to sit and stand for 30 minutes at a time

(Tr. 211-12). The VE testified that the hypothetical individual could not perform any of Plaintiff's past relevant work (Tr. 212). However, the VE identified other, unskilled jobs that the individual could perform, such as: electronics assembler (about 600 jobs in the greater Toledo area); mail clerk (550 jobs); inspector, electronics (600 jobs) (Tr. 212). The VE testified that he used the figures from the Ohio Department for Job and Family Services to arrive at the job numbers he provided, and that his testimony was consistent with the United States Department of Labor's Dictionary of Occupational Titles (DOT) (Tr. 213).

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b).

5

>    Joseph Thompson testified as VE at the 2007 hearing (Tr. 329-31). On questioning by Plaintiff's attorney, the VE confirmed that an individual who could only sit, stand, and walk a total of 1.75 hours in an 8-hour day could not do any job (Tr. 329).

(Doc. 20 at 1-9).

Magistrate Judge Perelman recommends that this Court affirm the final decision of the Commissioner denying Plaintiff's application for Disability Insurance benefits. Plaintiff filed an objection to the R&R on February 26, 2009 requesting that this Court not adopt the R&R, but remand for proper adjudication. For reasons discussed below, this Court agrees with the Magistrate Judge's findings that the Commissioner's denial of Plaintiff's application is supported by substantial evidence and, therefore, hereby adopts the recommendation in full. (Doc. 24).

**II. Standard of Review**

**A. Review of an R&R**

Any party may object to a magistrate judge's proposed findings, recommendations, or report made pursuant to Fed. R. Civ. P. 72(b). The district judge to whom the case was assigned may review a report or specified proposed findings or recommendations of a magistrate judge, to which proper objection is made, and may accept, reject, or modify in whole or in part the findings or recommendations of the magistrate judge. Fed. R. Civ. P. 72.3(b). This Court has reviewed the findings of the Magistrate Judge *de novo*. *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981).

**B. Disability standard**

A claimant is entitled to receive supplemental security income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result

6

in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505; *see id.* § 416.905.

A five-step sequential process, 20 C.F.R. § 404.1520, is employed by the ALJ to determine whether a claimant has a valid disability:

> First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. . . . Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)). If a claimant is found to be disabled or not disabled at any point in the evaluation process, the determination is made without completing the remaining steps. 20 C.F.R. § 404.1520(a).

"During the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing *Young v. Sec'y of Health & Human Services*, 925 F.2d 146, 148 (6th Cir. 1990)).

In the instant case, at Step Two the ALJ found that Plaintiff had degenerative disc disease. However, at Step Three the ALJ determined that Plaintiff did not meet a listed impairment. Moreover, at Step Five, the ALJ determined that other work exists in the national economy that plaintiff can perform.

**C. Review of Commissioner's decision**

Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive unless this Court finds no substantial evidence exists to support the decision. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981)). Deference must be given to the ALJ's decision, "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

The Sixth Circuit has explained that the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (citations and internal quotations omitted).

This Court may reverse the decision and remand for a new hearing if it determines that the ALJ's decision was not supported by substantial evidence. 42 U.S.C. § 405(g). This Court may also reverse the ALJ's decision and award benefits, but only when all essential factual issues have been resolved and the record unquestionably establishes a claimant's entitlement to benefits. *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

**III. Review of Plaintiff's objections**

In his brief on the merits directed to the Magistrate, Plaintiff argued: (1) the ALJ failed to give appropriate weight to Plaintiff's treating physicians; (2) the ALJ erred by improperly applying the Sixth Circuit's pain standard; (3) the Commissioner failed to show that there is other work in the national economy that Plaintiff can perform. In the R&R, the Magistrate first noted

8

that "the key to this case lies in the fact that the plaintiff's fully insured status . . . only extended to March 31, 2002." (Doc. 24 at 5-6). The Magistrate concluded that although Plaintiff submitted a January 29, 2003 Residual Functional Capacity report by Dr. Gainsburg, and an undated form from Dr. Pierce, "the ALJ fully explained the reason why he was not giving substantial credence to the evidence originating with Drs. Pierce and Gainsburg. Primary among [them] is that neither of those physicians had treated the plaintiff prior to the critical date of March 31, 2002." (*Id.*).

At this juncture, Plaintiff objects to the R&R and argues that neither the ALJ nor Magistrate Judge Perelman "followed the rules and regulations required to determine whether Claimant Swain was disabled prior to March 31, 2002." (Doc. 25 at 11). Plaintiff cites *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984) for the proposition that a claimant need not prove that he or she was disabled for a full twelve months prior to the expiration of their insured status, but rather that the onset of the disability occurred prior to the policy's expiration date. However, *Garner* is not relevant to the instant case because despite the ALJ's review of evidence from before and after the insured period, Plaintiff was never found to be disabled and this Court does not find that the ALJ acted outside of his discretion. Thus, the question as to when Plaintiff's disability began is not at issue because it presupposes that there was a disability finding to begin with.

Here, Plaintiff had some medical abnormalities during the insured period. Neither the ALJ nor the Magistrate ignored this evidence. (*See* Tr. 233-235; Doc. 24 at 6). To the contrary, the ALJ found that Plaintiff had severe impairments that limited him to a range of light work that included a sit-stand option. (Tr. 234). Given Plaintiff's age and education, Plaintiff must have been unable to perform work at the sedentary level to be considered disabled. *See* Rules 202.02-

9

.03, Table I, Appendix 2, Subpart P, Part 404.20 C.F.R.  However, many of Plaintiff's examinations yielded clinical findings that tended to undermine Plaintiff's allegations of total disability.

The physicians who endorsed Plaintiff's allegations of disabling pain saw him *after* the expiration of Plaintiff's policy.  A treating physician's opinion of a claimant's limitations is not owed great weight where it is based on a claimant's subjective complaints rather than objective findings.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004).  Here, Dr. Pierce did not see Plaintiff until nine months after the expiration of the insurance policy.  (Tr. 235).  Dr. Pierce cited cervical syndrome as one of Plaintiff's debilitating impairments despite medical evidence that Plaintiff did not develop a neck/shoulder/cervical problem until May 2003, more than a year after the expiration of the policy at issue.  (Tr. 19, 170).  When Dr. Salvi examined Plaintiff in June 2000, a few months after the expiration of the policy, Plaintiff had no abnormality in reflex, sensation, or motor abnormality.  (Tr. 129).  When Dr. Gainsburg examined Plaintiff in October 2002, he found normal neurological function in the lower and upper extremities.  (Tr. 174).  This is enough to put into question Dr. Pierce's opinion that Plaintiff had limited ability to grasp and perform fine manipulation dating back to January 2002.  (Tr. 19).

With regard to pain,[3] Dr. Pierce opined that Plaintiff had severe pain although the record showed that Plaintiff routinely took no pain medication, and in an exam a few months before Dr. Pierce's exam, Plaintiff reported a pain level of 3/10 in severity.  (Tr. 16, 128, 196, 199).  Plaintiff

---

[3] *See* 42 U.S.C. § 423(d)(5)(A) (individual's statement as to pain or other symptoms not conclusive of disability; must be medical signs and findings showing medical impairment resulting from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms)

also rejected injections for pain relief recommended by Dr. Hoeflinger, Salvi, and Bassett in 2002. (Tr. 126, 129, 191). However, Plaintiff told Dr. Calderon that he had taken "multiple narcotic medications including Vicodin, Percocet, Darvon" and had a high tolerance to those medications and needed to take an excessive amount (Tr. 188), but the record suggests no significant use of narcotic medications. (Tr. 235). Although Plaintiff contends that the ALJ did not properly evaluate his subjective complaints of pain, the ALJ expressly explained why he found Plaintiff's complaints not fully credible. (*See* Tr. 234-35).

Additionally, diagnostic and clinical findings generally failed to support Plaintiff's claims of debilitating symptoms and limitations. Post-surgery, Dr. O'Hara advised Plaintiff to resume normal activities if he did well in physical therapy. (Tr. 115). In April 2002, Dr. Hoeflinger found normal motor and sensory function and steady gait. (Tr. 126). In June 2002, Dr. Salvi noted that Plaintiff had no exacerbation of pain with extension or flexion of the lumbar spine or lateral bending in addition to normal reflexes, sensation, muscle power, and gait. (Tr. 129). In July 2002, Dr. Bassett had mixed clinical findings, but Dr. Gainsburg's October 2002 examination revealed no neurologic abnormality. (Tr. 174). Dr. Gainsburg further indicated that February and November 2002 MRIs showed "expected postoperative changes" suggesting that objective diagnostic medical evidence failed to provide a basis for the debilitating limitations Plaintiff claimed. (Tr. 74, 148-51, 172).

While Dr. Gainsburg opined in January 2003 that Plaintiff was capable of less than sedentary work, the ALJ reasonably concluded that Dr. Gainsburg's opinion was inconsistent with his own reported findings. (Tr. 168, 236). Even Plaintiff admitted that he could lift a gallon of milk, which weighs more than the five pounds to which Dr. Gainsburg limited Plaintiff's lifting.

11

(Tr. 168, 208). Dr. Gainsburg's characterization of Plaintiff's pain also stands in contrast to Plaintiff's lack of significant medication or other post-surgical treatment, as discussed above. The ALJ reasonably declined to accord great weight to Dr. Gainsburg's January 2003 opinion. These findings fail to disprove that substantial evidence supports the ALJ's opinion.

Plaintiff also argues that the ALJ failed to account for the psychological problems Plaintiff experienced in conjunction with his physical problems. Plaintiff has not provided any substantive support for this assertions. Furthermore, this claim was not raised in the R&R and is thus waived here. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995).

The ALJ adequately articulated his reasons for weighing the evidence as he did, and his rationale was reasonable and well within the broad range of discretion owed under the substantial evidence standard. While Plaintiff was undoubtedly limited by his back impairment prior to the expiration of his insured status, substantial evidence supports the ALJ's finding that he could perform the limited range of light work set forth in the RFC finding. The VE's uncontradicted testimony provides substantial evidence supporting the ALJ's conclusion that Plaintiff could perform a significant number of jobs despite the limitations the ALJ found credibly established by the evidence. This Court affirms the ALJ's decision.

**IV. Conclusion**

For the reasons discussed herein, the Court adopts the Report & Recommendation of the Magistrate Judge in its entirety. (Doc. 24). The Court affirms the ALJ's decision denying Plaintiff's application for disability insurance benefits.

IT IS SO ORDERED.

   s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE